UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| BREANNE MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:21 CV 56 ACL |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM</u>**

Plaintiff Breanne Miller brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of the Social Security Administration Commissioner's denial of her application

for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and

Supplemental Security Income ("SSI") under Title XVI of the Act.

An Administrative Law Judge ("ALJ") found that, despite Miller's severe impairments,

she was not disabled as she had the residual functional capacity ("RFC") to perform work

existing in significant numbers in the national economy.

This matter is pending before the undersigned United States Magistrate Judge, with

consent of the parties, pursuant to 28 U.S.C. § 636(c).   A summary of the entire record is

presented in the parties' briefs and is repeated here only to the extent necessary.

For the following reasons, the decision of the Commissioner will be affirmed.

### I.   Procedural History

Miller filed her applications for benefits on April 3, 2019.   (Tr. 202-17.)   She claimed

she became unable to work on August 11, 2017, due to back and neck injuries, bilateral leg

numbness, tingling legs, tingling arms, "throbbing/sharp pain," tailbone surgery, and a cyst.

(Tr. 203, 245.)   Miller was 32 years of age at her alleged onset of disability date.   Her

applications were denied initially.   (Tr. 124-29.)   Miller's claims were denied by an ALJ on

July 2, 2020.   (Tr. 12-21.)   On November 25, 2020, the Appeals Council denied Miller's claim

for review.   (Tr. 1-4.)   Thus, the decision of the ALJ stands as the final decision of the

Commissioner.   *See* 20 C.F.R. §§ 404.981, 416.1481.

In this action, Miller first argues that the ALJ's decision "lacks a proper pain evaluation."

(Doc. 31 at 3.)   She next argues that "the opinion evidence is not properly evaluated."   *Id.* at 6.

## II.  The ALJ's Determination

The ALJ first found that Miller met the insured status requirements of the Social Security

Act through December 31, 2022.   (Tr. 14.)   He stated that Miller has not engaged in substantial

gainful activity since her alleged onset date.   (Tr. 15.)   In addition, the ALJ concluded that

Miller had the following severe impairment: degenerative disc disease.   *Id.*   The ALJ found that

Miller did not have an impairment or combination of impairments that met or medically equaled

the severity of one of the listed impairments.   *Id.*

As to Miller's RFC, the ALJ stated:

> After careful consideration of the entire record, the undersigned
> finds that the claimant has the residual functional capacity to
> perform sedentary work as defined in 20 CFR 404.1567(a) and
> 416.967(a) except: Redefined as retaining the ability to lift and
> carry up to the exertional limits; however, she is able to stand or
> walk for no more than 60 minutes during a normal eight-hour
> workday; is able to sit for up to eight hours during a normal eight-
> hour workday, with normal breaks.   She is unable to climb
> ladders, ropes or scaffolds, but she can occasionally climb ramps
> or stairs, stoop, kneel, crouch and crawl.   She is unable to reach

> overhead.   She is to avoid extreme vibration, all operational
> control of moving machinery, working at unprotected heights, and
> the use of hazardous machinery.   She requires a sit/stand option
> every 60 minutes throughout the eight-hour workday for a brief
> period of time.

(Tr. 15.)

The ALJ found that Miller was unable to perform her past relevant work as a pipe fitter

helper, but she was capable of performing other work existing in significant numbers in the

national economy.   (Tr. 19-20.)   The ALJ therefore concluded that Miller was not under a

disability, as defined in the Social Security Act, from August 11, 2017, through the date of the

decision.   (Tr. 21.)

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability
> insurance benefits protectively filed on April 3, 2019, the claimant
> is not disabled under sections 216(i) and 223(d) of the Social
> Security Act.

> Based on the application for supplemental security income
> protectively field on April 3, 2019, the claimant is not disabled
> under section 1614(a)(3)(A) of the Social Security Act.

*Id.*


## III.   Applicable Law

### III.A.  Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial

evidence on the record as a whole.   42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389,

401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).   Substantial evidence is less

than a preponderance of the evidence, but enough that a reasonable person would find it adequate

to support the conclusion.   *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).   This

"substantial evidence test," however, is "more than a mere search of the record for evidence

supporting the Commissioner's findings."   *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir.

2007) (internal quotation marks and citation omitted).   "Substantial evidence on the record as a

whole . . . requires a more scrutinizing analysis."   *Id.* (internal quotation marks and citations

omitted).

      To determine whether the Commissioner's decision is supported by substantial evidence

on the record as a whole, the Court must review the entire administrative record and consider:

1.     The credibility findings made by the ALJ.

2.     The plaintiff's vocational factors.

3.     The medical evidence from treating and consulting physicians.

4.     The plaintiff's subjective complaints relating to exertional and
     non-exertional activities and impairments.

5.     Any corroboration by third parties of the plaintiff's
     impairments.

6.     The testimony of vocational experts when required which is
     based upon a proper hypothetical question which sets forth the
     claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal

citations omitted).   The Court must also consider any evidence which fairly detracts from the

Commissioner's decision.   *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050

(8th Cir. 1999).   However, even though two inconsistent conclusions may be drawn from the

evidence, the Commissioner's findings may still be supported by substantial evidence on the

record as a whole.   *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).   "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision."   *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); s*ee also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).   Put another way, a court should "disturb the ALJ's decision only if it falls outside the available zone of choice." *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015) (citation omitted).

### III.B.  Determination of Disability

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905.   A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience engage in any kind of substantial gainful work which exists … in significant numbers in the region where such individual lives or in several regions of the country."   42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations.   20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).   First, the Commissioner will consider a claimant's work activity.   If the claimant is engaged in substantial gainful activity, then the claimant is not disabled.   20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 343 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, reaching out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id*. § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on his ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to

determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work.   20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4).   "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or his physical or mental limitations."   *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1).   The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources."   20 C.F.R. § 416.945(a)(3).   The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations.   *See id*.   If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled.   *Id*. § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his age, education, and work experience.   *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n. 5 (8th Cir. 2000).   The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy.   *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v).   If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled.   If the claimant cannot make an adjustment to other work, then the Commissioner

will find that the claimant is disabled.   20 C.F.R. § 416.920(a)(4)(v).   At Step Five, even though

the burden of production shifts to the Commissioner, the burden of persuasion to prove disability

remains on the claimant.   *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

## IV.  Discussion

As previously noted, Miller raises two claims.   The undersigned will discuss them in

turn.

### 1.  Subjective Complaints

Miller first argues that the ALJ failed to discuss the *Polaski* factors when determining the

credibility of Miller's subjective complaints of pain.

When determining a claimant's RFC, the ALJ must evaluate the credibility of the

claimant's subjective complaints.[1]  *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Tellez*

*v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005).   In doing so, the ALJ must consider the

claimant's prior work record and third-party observations as to the claimant's daily activities; the

duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the

dosage, effectiveness and side effects of medication; and any functional restrictions.   *Halverson*

*v. Astrue*, 600 F.3d 922, 931 (8th Cir. 2010); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir.

1984).   The ALJ is not mechanically obligated to discuss each of the above factors, however,

when rejecting a claimant's subjective complaints, the ALJ must make an express credibility

determination detailing his or her reasons for discrediting the testimony, and the ALJ's

credibility assessment must be based on substantial evidence.   *Vick v. Saul*, No. 1:19 CV 232

---

[1]Social Security Ruling 16-3p eliminated the term "credibility" from the analysis of subjective complaints.   However, the regulations remain unchanged; "Our regulations on evaluating symptoms are unchanged."   SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017); 20 C.F.R. §§ 404.1529, 416.929.

CDP, 2021 WL 663105, at *8 (E.D. Mo. Feb. 19, 2021) (citing *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012); *Grba-Craghead v. Astrue*, 669 F. Supp. 2d 991, 1008 (E.D. Mo. 2009)).   On review by the court, "[c]redibility determinations are the province of the ALJ." *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1090 (8th Cir. 2018) (quoting *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016)).   The court defers to the ALJ's determinations "as long as good reasons and substantial evidence support the ALJ's evaluation of credibility." *Id.*

The ALJ summarized Miller's testimony regarding her limitations as follows, in relevant part:

> She testified to back pain with shooting pain in her extremities.   She stated that she was unable to walk long distances and had to stop when walking across the room during the exam.   She claimed that she could stand, sit, or walk for 30 minutes.   She alleged that she needs to lie down every 30 minutes to relieve pain. She claimed that she could lift her arms for 5 minutes at most before going numb or tingling.   She claimed that she could not use a keyboard for more than 5 or 10 minutes.   She reported that she could lift 5 to 10 pounds, perhaps maximally 15. She claimed to have a headache a couple of times a week.

(Tr. 16.)

The ALJ determined that, although plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, her statements regarding the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record.   *Id.*   The Court finds that the ALJ appropriately considered Miller's subjective allegations.

The ALJ first discussed the medical evidence.   (Tr. 16-18.)   A summary of the medical evidence cited by the ALJ is provided below:

On June 28, 2017, Miller was injured at work during advanced rescue training at a nuclear plant in South Carolina.   (Tr. 16, 322, 324.)   She was suspended in a harness when she was dropped two to four feet abruptly.   *Id.*   Miller presented to physical therapist Brian Gray on

August 7, 2017, upon the referral of her employer.   (Tr. 324.)   She had not yet seen a physician or undergone imaging.   *Id.*   Miller complained of constant trap and upper cervical pain since her injury.   *Id.*   Upon examination, Mr. Gray found Miller had full strength in the bilateral upper extremities, but all resisted motions were painful.   *Id.*   He recommended physical therapy in conjunction with a home exercise program.   (Tr. 325.)   Miller participated in physical therapy through August 30, 2017.   (Tr. 339-349.)   Mr. Gray indicated that Miller's pain was decreasing and her mobility continued to improve, but she was discontinued from therapy secondary to moving to Kentucky.   (Tr. 350.)   He recommended that Miller continue therapy in Kentucky.   *Id.*

Miller saw orthopedist Richard McCain, M.D., in South Carolina on August 10, 2017. (Tr. 322.)   On examination, Dr. McCain noted decreased range of motion of the cervical spine in lateral rotation, paracervical tenderness, and interscapular tenderness; intact strength of the upper extremities; intact reflexes and pulses; and diminished sensation in the left thumb and long finger.   *Id.*   X-rays of the cervical spine were normal.   *Id.*   Dr. McCain diagnosed Miller with cervical sprain.   *Id.*   He prescribed Mobic[2] and physical therapy, and indicated Miller would be out of work for three weeks.   *Id.*   At Miller's August 30, 2017 follow-up, she reported that the Mobic had not been helpful.   (Tr. 323.)   Dr. McCain prescribed Celebrex.[3]   *Id.*

Miller presented to Benjamin Crane, M.D., in St. Louis, Missouri, for an independent orthopedic evaluation on January 11, 2018.   (Tr. 16, 356.)   Miller complained of neck and low back pain.   (Tr. 356.)   She described the pain as 50 percent neck pain and 50 percent back pain,

---

[2]Mobic is a non-steroidal anti-inflammatory drug indicated for the treatment of arthritis.   *See* WebMD, http://www.webmd.com/drugs (last visited August 15, 2022).

[3]Celebrex is a non-steroidal anti-inflammatory drug indicated for the treatment of arthritis.   *See* WebMD, http://www.webmd.com/drugs (last visited August 15, 2022).

rating both about an eight to nine out of ten, with no radicular symptoms of pain into the arms or legs.  *Id.*   Miller had not undergone "any real treatment directed at her back pain other than minimal physical therapy," and had not taken an anti-inflammatory drug.  *Id.*   Upon examination, Dr. Crane noted Miller's lateral flexion of the cervical spine was ten degrees bilaterally, extension was twenty degrees bilaterally, and rotation was ten degrees bilaterally. (Tr. 357.)   She had increased pain when looking up and down.  (Tr. 358.)   Miller's gait was normal, she was able to heel-and-toe walk normally, and she had full strength in the upper and lower extremities.  *Id.*   Dr. Crane reviewed x-rays of the cervical, thoracic, and lumbar spine, which were normal.  (Tr. 359.)   He prescribed Naprosyn[4] and physical therapy, and placed Miller on temporary light duty work restrictions.  *Id.*   Dr. Crane saw Miller on February 7, 2018.  (Tr. 365.)   Miller had completed a course of physical therapy and reported that she was "not much better."  *Id.*   She reported pain in her neck and back, which she rated as a four to five out of ten.  *Id.*   Dr. Crane's findings on examination were unchanged.  (Tr. 366-67.)   He ordered MRI scans and continued Miller's light duty restrictions.  (Tr. 367.)   On March 2, 2018, Miller rated her neck and back pain as a three to four out of ten.  (Tr. 369.)   Dr. Crane indicated that the MRI of the cervical spine Miller had undergone revealed an annular tear with small disc bulge at the C5-6 level, resulting in very minimal central and lateral recess stenosis. (Tr. 371.)   The MRI of the lumbar spine revealed disc desiccation with a broad-based disc bulge at the L4-5 level, causing moderate central and lateral recess stenosis; and disc desiccation and disc height loss with a small annular tear at the L5-S1 level, resulting in very mild central stenosis.  *Id.*   Dr. Crane indicated that he did not feel there was anything surgical he could offer

---

[4]Naprosyn is a non-steroidal anti-inflammatory drug indicated for the treatment of arthritis.  *See* WebMD, http://www.webmd.com/drugs (last visited August 15, 2022).

for Miller's neck and backpain.  *Id.*   Instead, he recommended a course of work hardening followed by a functional capacity evaluation.  *Id.*   He continued Miller's light duty restrictions.  *Id.*   On April 12, 2018, Miller reported that she had increased pain following the work hardening and functional capacity evaluation, but she has returned to her baseline level of pain of four to five out of ten in her neck and back.  (Tr. 375.)   Dr. Crane stated that the functional capacity evaluation demonstrates that Miller gave a variable effort, but that she nonetheless met the requirements of her medium exertional level job.  (Tr. 377.)   He found that Miller was at maximum medical improvement and can return to work without restrictions.  *Id.*

On June 25, 2018, Miller saw Tracy Hill, P.T., in South Carolina, for a Functional Capacity Evaluation.  (Tr. 17, 389.)   Ms. Hill found that Miller could lift from thirteen to twenty pounds occasionally, carry twenty-two pounds with two hands, carry fifteen pounds with one hand, and push twenty-five pounds.  (Tr. 389.)   Miller reported that she could sit, stand, and walk for sixty minutes each.  *Id.*   Her cervical and lumbar range of motion were limited.  *Id.*

Miller presented to the emergency room in Owensboro, Kentucky, on August 21, 2018, with complaints of a cyst on her tailbone.  (Tr. 17, 426.)   She indicated she had a history of this type of cyst.  (Tr. 426.) On examination, Miller had full range of motion in all extremities.  (Tr. 427.)   Erythema and tenderness was noted to the superior buttocks, midline.  *Id.*   Miller was diagnosed with a pilonidal cyst[5] with abscess.  (Tr. 429.)   The abscess was incised and drained in the emergency room, and Miller was discharged.  *Id.*   Miller was seen by surgeon Michael Ray West, M.D., on January 8, 2019, for treatment of a cyst at the base of her tail bone.  (Tr.

---

[5]An abnormal skin growth located at the tailbone that contains hair and skin.  *See* WebMD, https://www.webmd.com/skin-problems-and-treatments/guide/pilondial-cyst (last visited August 15, 2022).

484.)   Dr. West indicated that Miller was "somewhat transient," and has had multiple previous

cysts at the base of her tail bone.   *Id.*   On examination, Dr. West noted an infected pilonidal

cyst, but found Miller's gait was intact and her examination was otherwise normal.   (Tr. 485.)

He drained the cyst.   *Id.*   Miller saw Dr. West on February 5, 2019, when the cyst partially

reopened and had to be repacked.   (Tr. 490-92.)   Miller returned to Dr. West for monitoring of

the cyst weekly for three weeks.   (Tr. 494-500.)   She presented to the emergency room in St.

Louis, Missouri, on February 27, 2019, for treatment of her cyst.   (Tr. 539.)   She reported that

she had been treated for an abscess while visiting her boyfriend in Kentucky, and was now

seeking management of the wound.   *Id.*   On examination, Thomas Riechers, M.D. noted that

the wound was slightly malodorous but had no drainage.   (Tr. 541.)   Miller had no pain

complaints and her gait was normal.   *Id.*   Dr. Riechers irrigated and packed the wound, and

advised Miller to take over-the-counter pain medication.   *Id.*   Miller saw Dr. Riechers

approximately every two weeks through April 17, 2019, for management of the wound.   (Tr.

509-24.)   Dr. Riechers irrigated and packed the wound, and noted that the wound was

improving.   (Tr. 511, 515. 519.)   Miller did not report any back or neck pain on any of these

visits.   *Id.*

On August 10, 2019, Miller saw Raymond Leung, M.D., for an internist examination at

the request of the state agency.   (Tr. 18, 531-33.)   Miller complained of neck and back pain,

and indicated that her arms and legs "may tingle."   (Tr. 531.)   She reported that she does not

use a cane or a walker, and she does not take any pain medications.   *Id.*   On examination,

Miller walked with a mild to moderate limp; was able to walk 50 feet unassisted; was able to

tandem walk and hop; was able to heel and toe walk; she had difficulty getting on and off the

exam table; straight leg raising with each leg was positive at ten degrees; she had decreased

range of motion in the cervical and lumbar spine; there was no muscle atrophy, edema, or spasms; she had full grip strength; and her neurologic examination was normal.   (Tr. 533.)

On October 11, 2019, Miller presented to Trevor King, M.D., in Owensville Missouri, to establish care.   (Tr. 18, 576.)   She complained of sharp pain in the neck and back, with tingling and numbness throughout her body.   (Tr. 576.)   Miller indicated that she had been prescribed strong pain medication in the past in South Carolina, but she was not "much of a medicine taker."   *Id.*   Dr. King noted no abnormalities on examination.   (Tr. 577.)   He diagnosed Miller with chronic pain syndrome, for which he prescribed Norco[6] and referred her to a pain clinic. (Tr. 579.)

Miller established pain management care with Kenneth Naylor, M.D., in Washington, Missouri, on December 17, 2019.   (Tr. 18, 607.)   Miller reported low back pain that radiates into her leg to her feet; neck pain that radiates into her bilateral arms down to her hands; and numbness, tingling, and weakness bilaterally in the upper and lower extremities.   (Tr. 607.) She indicated that she had undergone cervical nerve blocks in 2017 that provided little to no relief, as well as physical therapy, massage, a TENs unit, and wet needling.   *Id.*   She reported that she was applying for disability and has a lawyer.   *Id.*   Upon examination, Miller's cervical range of motion was limited; and her lumbar range of motion was full, although she had pain with bilateral lumbar facet loading.   (Tr. 611.)   Miller's gait was antalgic, her station was stable, she was able to heel and toe walk, and was able to ambulate without assistance; she had normal coordination and balance; and her sensation was intact.   (Tr. 612.)   Dr. Naylor assessed Miller with chronic neck pain, chronic bilateral low back pain without sciatica, chronic pain

_____

[6]Norco is a narcotic medication consisting of the opioid pain reliever hydrocodone and non-opioid pain reliever acetaminophen.   It is indicated for the treatment of moderate to severe pain. *See* WebMD, http://www.webmd.com/drugs (last visited August 15, 2022).

syndrome, and whole-body pain.   (Tr. 613-14.)   He stated that Miller could not give an accurate description of any dermatomal pattern of pain in the neck or back and states that she "hurts all over."   (Tr. 614.)   Dr. Naylor noted that Miller's widespread nondescript pain symptoms were more consistent with fibromyalgia.   *Id.*   He stated that Miller's "exam shows nothing objective that would prevent her from working," and that her "complaints are all subjective complaints of widespread pain."   *Id.*   Dr. Naylor recommended conservative therapy and imaging of the cervical and lumbar spine.   (Tr. 616.)   Miller underwent x-rays on that date, which revealed straightening of the normal lumbar lordosis with mild degenerative disc disease at L4-L5 and L5-S1.   (Tr. 619.)   Her x-rays of the cervical spine were normal.   (Tr. 622.)

Miller followed-up with Dr. King on January 20, 2020, at which time Miller complained of a rash.   (Tr. 18, 627.)   Dr. King noted that Dr. Naylor had stopped Miller's opioid for her back pain.   *Id.*   He noted no musculoskeletal abnormalities on examination.   (Tr. 628.)

Miller underwent a physical therapy initial evaluation on March 9, 2020, upon the referral of Dr. Naylor.   (Tr. 18, 638.)   She reported generalized muscle spasms, twitching, and pain in her "whole body" since her 2017 work accident, which interfered with all of her activities of daily living.   (Tr. 640.)   Physical therapist Katherine Curran described Miller's symptoms as "very generalized," and noted that Miller had difficulty saying if anything makes her pain better or worse.   *Id.*   Miller reported that she was told to try six visits of physical therapy so that she can "be approved for disability."   *Id.*   Upon examination, Miller ambulated without assistive devices with a guarded and slow gait; she had deficits in cervical and lumber range of motion; and decreased lower and upper extremity strength.   (Tr. 640-42.)   Ms. Curran found that Miller would benefit from therapy to return to her prior level of function.   (Tr. 642.)

The ALJ concluded that Miller's statements about the limiting effects of her symptoms were inconsistent with the medical records.   (Tr. 16.)   The undersigned finds that the ALJ properly assessed the severity and intensity of symptoms resulting from Miller's impairments.

The ALJ first stated that Miller received "very little treatment after the initial injury consistent with the limited objective findings at the time."   (Tr. 19.)   This finding is supported by the record.   The record reveals Miller sustained her work injury on June 28, 2017.   (Tr. 322, 324.)   When she presented to physical therapist Mr. Gray on August 7, 2017, she had not yet seen a physician or undergone imaging.   (Tr. 324.)   She participated in physical therapy and received treatment from Dr. McCain through August 30, 2017, but did not receive treatment again for her neck or back impairments until her January 11, 2018 consultative examination with Dr. Crane.   (Tr. 356.)   At that time, Dr. Crane remarked that Miller had not undergone "any real treatment directed at her back pain other than minimal physical therapy," and had not taken an anti-inflammatory drug.   *Id.*   Miller saw Dr. Crane approximately monthly through April 2018. Although Miller underwent consultative examinations and sought emergency room treatment for her cyst, she did not seek treatment for her neck or back impairments again until she presented to Dr. King in October 2019 to establish care.   (Tr. 576.)   A claimant's "failure to seek treatment" is not dispositive, though it certainly "may indicate the relative seriousness of a medical problem."   *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995).   The ALJ properly considered Miller's failure to seek regular treatment for her neck and back impairments as one factor detracting from the credibility of her subjective complaints.

The ALJ next stated that limited objective findings were noted on examination.   (Tr. 19.) For example, he noted that no gait problems were documented until Miller's 2019 consultative examination, and even then she was able to complete gait-related tasks without issue.   (Tr. 19,

533.)   The ALJ pointed out that Miller continued to have little objective findings in 2019, and both her primary care and pain management physician opined that she had a chronic pain disorder.   (Tr. 577-79, 613-14.)   The ALJ acknowledged objective findings such as reduced strength and range of motion, a positive straight leg test, and imaging showing annular tears with disc bulging at C5-C6 and L4-L5 resulting in moderate stenosis (Tr. 322, 357, 533, 611, 640-42), but stated that her complaints continued to be inconsistent with the findings.   In fact, Dr. Naylor stated that Miller's complaints "are all subjective complaints of widespread pain," and that there were no objective findings that would prevent her from working.   (Tr. 614.)   The ALJ properly recognized that the objective medical evidence fails to substantiate Miller's complaints of disabling pain.   *See, e.g., Goff v. Barnhart,* 421 F.3d 785, 792 (8th Cir. 2005) (holding that it was proper for the ALJ to consider unremarkable or mild objective medical findings as one factor in assessing credibility of subjective complaints).

The ALJ also considered that Miller "moved at one point and traveled to see her boyfriend, which was inconsistent with her testimony at the hearing."   (Tr. 19.)   The record reveals that Miller frequently moved to different states, resulting in one examining physician describing her as "transient."   (Tr. 484.)   She received treatment for an abscess while visiting her boyfriend in Kentucky.   (Tr. 426.)   The fact that Miller was able to frequently travel appears inconsistent with her allegations of disabling whole-body pain.

In sum, the ALJ thoroughly reviewed Miller's testimony and other evidence of record in a manner consistent with *Polaski*, and articulated specific reasons to find her symptoms and limitations were inconsistent with the record.   Because this determination is supported by good reasons and substantial evidence on the record as a whole, the undersigned must defer to it. *Julin*, 826 F.3d at 1086.

## 2.  Opinion Evidence and RFC

Miller next argues that the ALJ erred in determining her RFC.   Specifically, she contends that the ALJ failed to properly evaluate the medical opinion evidence.

A claimant's RFC is the most she can do despite her physical or mental limitations. *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).   It is the ALJ's responsibility to determine a claimant's RFC by evaluating all medical and non-medical evidence of record.   20 C.F.R. §§ 404.1545, 404.1546, 416.945, 416.946.   Some medical evidence must support the ALJ's RFC finding, but there is no requirement that the evidence take the form of a specific medical opinion from a claimant's physician.   *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012); *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011).   "The determination of a claimant's RFC during an administrative hearing is the ALJ's sole responsibility and is distinct from a medical source's opinion."   *Wallenbrock v. Saul*, No. 4:20-CV-00182-SRC, 2021 WL 1143908, at *6 (E.D. Mo. Mar. 25, 2021) (citing *Kamann v. Colvin*, 721 F.3d 945, 950-51 (8th Cir. 2013)).

The ALJ found that Miller had the RFC to perform sedentary work, but was able to stand or walk for only sixty minutes during a normal eight-hour workday; was unable to climb ladders, ropes or scaffolds; could only occasionally climb ramps or stairs, stoop, kneel, crouch and crawl; was unable to reach overhead; must avoid extreme vibration, all operational control of moving machinery, working at unprotected heights, and the use of hazardous machinery; and requires a sit/stand option every sixty minutes throughout the eight-hour workday for a brief period of time. (Tr. 15.)   In making this determination, the ALJ assessed the consistency of Miller's subjective complaints with the record as discussed above.   The ALJ also evaluated the medical opinion evidence.

A "medical opinion" is a statement from a medical source about what an individual can still do despite his impairments, and includes limitations or restrictions about the ability to perform physical, mental, sensory, and/or environmental demands of work. 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2). Under the revised Social Security regulations,[7] the agency "[w]ill not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(b)(2). Instead, the ALJ must assess the persuasiveness of all medical opinions and prior administrative medical findings using a number of factors, including 1) the supportability of the opinion with objective medical evidence and explanations; 2) the consistency of the opinion with evidence from other medical and nonmedical sources; 3) the relationship of the provider to the claimant, including the length, nature and frequency of treatment; 4) the specialization of the provider; and 5) other factors, including the source's familiarity with the Social Security guidelines. *See* 20 C.F.R. § 404.1520c. The ALJ must explain how they considered the factors of supportability and consistency in their decisions but are not statutorily required to discuss the other factors. 20 C.F.R. § 404.1520c(b)(2).

The ALJ first discussed the opinion of state agency medical consultant David Marty, M.D. (Tr. 19.) On September 3, 2019, Dr. Marty expressed the opinion that Miller was capable of sedentary work with the additional limitations of occasional climbing, balancing, stooping, crouching, and crawling; and avoiding concentrated exposure to extreme cold and

---

[7]The new regulations are applicable to Miller's claims because she filed her appeal after March 27, 2017. *See* 20 C.F.R. §§ 404.1520c, 416.920c.

wetness.   (Tr. 101.)   The ALJ found Dr. Marty's opinion was "unpersuasive," in that the record

as a whole supported *additional* limitations.   (Tr. 19.)

Miller argues that the ALJ's conclusion "is not adequate because it provides no real

details to help a reader understand why Dr. Marty's opinion was disregarded."   (Doc. 31 at 7-8.)

The ALJ did not disregard Dr. Marty's opinion but, instead, found that Miller was *more limited*.

The additional limitations the ALJ found are reflected in his RFC assessment: able to stand or

walk for only 60 minutes; unable to climb ladders, ropes or scaffolds; unable to reach overhead;

must avoid extreme vibration, all operational control of moving machinery, working at

unprotected heights, and the use of hazardous machinery; and requires a sit/stand option every 60

minutes throughout the eight-hour workday for a brief period of time.   (Tr. 15.)   It is unclear

why Miller objects to the ALJ's determination that Miller was more limited than found by the

state agency medical consultant.   The ALJ properly evaluated Dr. Marty's opinion.

The ALJ next discussed the opinion of Dr. Crane.   Dr. Crane initially limited Miller to a

range of sedentary work, but on April 12, 2018, he found Miller was at maximum medical

improvement and returned her to her medium exertional level work with no restrictions.   (Tr.

364, 367-68, 371, 374.)   The ALJ found Dr. Crane's opinion that Miller could return to work

with no restrictions "was inconsistent with the reported pain and limited improvement during the

course of treatment."   (Tr. 19.)   He therefore found Dr. Crane's opinion was "not supported by

his exams or the record as a whole."   *Id.*   The ALJ properly evaluated the supportability and

consistency of Dr. Crane's opinion.   As previously discussed, the imaging and findings on

examination reveal Miller experienced abnormalities resulting from her degenerative disc

disease.   There is no support for Dr. Crane's opinion that Miller would be capable of returning

to *medium work* with no restrictions.

Finally, the ALJ considered the opinion of physical therapist Ms. Hill.   (Tr. 19.)   Ms. Hill saw Miller for a functional capacity evaluation on June 25, 2018.   (Tr. 389.)   She expressed the opinion that Miller met the physical requirements necessary for sedentary work, with additional limitations of avoiding sitting for over sixty minutes at a time, and no squatting or reaching overhead.   (Tr. 389.)   The ALJ found Ms. Hill's opinion "generally persuasive," in that it was "generally consistent" with her exam.   (Tr. 19.)

Miller contends that the ALJ erred in finding Ms. Hill's opinion persuasive because, as a physical therapist, Ms. Hill is not an "acceptable medical source."   (Doc. 31 at 8.)   The ALJ did not, however, rely on Ms. Hill's opinion.   He found it was "generally persuasive" as it was "generally consistent" with her own examinations, but he did not adopt Ms. Hill's findings. Instead, the ALJ found Miller had *greater limitations* not found by Ms. Hill, as reflected in his RFC assessment discussed above.   The ALJ did not, therefore, err in evaluating Ms. Hill's opinion.

The ALJ's RFC determination that Miller remains capable of performing a very limited range of sedentary work is supported by the record as a whole.   It is consistent with the treatment notes of Miller's various providers, which reveal Miller had some limitations of motion of the cervical and lumbar spine resulting from her degenerative disc disease, but remained capable of ambulating without assistive devices and had intact coordination and sensation.   Significantly, Miller's treating providers Drs. King and Naylor both found the objective evidence did not support Miller's subjective complaints and diagnosed her with a chronic pain disorder.   Dr. Naylor found that there were no objective findings that would prevent Miller from working, and every other provider who offered an opinion found Miller was less limited than found by the ALJ.   Further, the ALJ considered Miller's infrequent and

conservative treatment for her back and neck impairments and her ability to travel frequently during the relevant period despite her complaints of disabling full-body pain.   Miller has failed to demonstrate that the ALJ's decision was outside the available "zone of choice."

Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.

/s/ *Abbie Crites-Leoni*
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 9th day of September, 2022.